## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JESSICA M. PROANO,

    Plaintiff,

   v.            Civ. No. 21-1047 KK

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

    Defendant.

### <u>MEMORANDUM OPINION AND ORDER[1]</u>

  THIS MATTER is before the Court on Plaintiff Jessica Proano's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 22), filed April 19, 2022. On July 18, 2022, the Acting Commissioner of the Social Security Administration ("Commissioner") filed a response, and on August 3, 2022, Ms. Proano filed a reply. (Docs. 25, 26.) Having meticulously reviewed the entire record and the relevant law, being otherwise sufficiently advised, and for the reasons set forth below, the Court finds that Ms. Proano's motion is well-taken and should be GRANTED.

### I. BACKGROUND AND PROCEDURAL HISTORY

  Ms. Proano filed this action under 42 U.S.C. § 405(g), seeking reversal of the Commissioner's September 2021 decision denying her claims for disability insurance benefits ("DIB") under Title II, and Supplemental Security Income ("SSI") under Title XVI, of the Social Security Act. (Doc. 22 at 1-6.) This is Ms. Proano's third appeal of the Commissioner's denial of benefits. (*Id.*) Ms. Proano has a high school diploma that was awarded to her upon completion of

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 13.)

her individualized education program ("IEP"). (AR 67, 633-35.[2]) Before her alleged onset date, she worked at a variety of different jobs, including as a cashier, cleaner, wood sander, cabinet measurer, greeter, stocker, and pretzel twister. (AR 68-72, 92-93, 1150-51, 1160.) Now 40, Ms. Proano suffers from the severe, medically determinable impairments of intellectual disorder, specific learning disorder in reading, depression, anxiety, obsessive-compulsive disorder ("OCD"), post-traumatic stress disorder ("PTSD"), post-prandial hypoglycemia,[3] iron deficiency anemia,[4] migraine headaches, and sciatica. (AR 67, 1769.)

### A. Procedural History

Ms. Proano filed her claims for DIB and SSI on May 28, 2014, alleging disability beginning on April 1, 2013, due to hypoglycemia, OCD, and learning disability. (AR 100-01, 114-15.) Ms. Proano's claims were denied initially and upon reconsideration. (AR 128-29, 160-61.) On June 1, 2015, she requested a hearing before an Administrative Law Judge ("ALJ"), which ALJ Frederick Upshall, Jr., held in person on March 13, 2017. (AR 60-99, 178-79.) At the hearing, at which Ms. Proano was represented by counsel, Ms. Proano and a vocational expert ("VE") testified. (AR 60-

---

[2]Citations to "AR" refer to the Certified Transcript of the Administrative Record filed on February 4, 2022. (Doc. 16.)

[3]Hypoglycemia "happens when the level of sugar (glucose) in your blood drops below the range that's healthy for you." https://my.clevelandclinic.org/health/diseases/11647-hypoglycemia-low-blood-sugar (last accessed Feb. 7, 2023). Symptoms include pallor, shakiness, sweating, headache, nausea, heart palpitations, fatigue, irritability, anxiety, difficulty concentrating, dizziness, lightheadedness, confusion, inability to complete routine tasks, blurry vision, nightmares, and loss of consciousness. https://www.mayoclinic.org/diseases-conditions/hypoglycemia/symptoms-causes/syc-20373685 (last accessed Feb. 7, 2023). "Hypoglycemia needs immediate treatment," which "involves quickly getting your blood sugar back to within the standard range either with a high-sugar food or drink or with medication. Long-term treatment requires identifying and treating the cause of hypoglycemia." *Id.*

[4]Iron deficiency anemia is "a condition in which blood lacks adequate healthy red blood cells … due to insufficient iron." https://www.mayoclinic.org/diseases-conditions/iron-deficiency-anemia/symptoms-causes/syc-20355034 (last accessed Feb. 7, 2023). Symptoms include extreme fatigue, weakness, pallor, heart palpitations, shortness of breath, headache, dizziness, and lightheadedness. *Id.*

99.) On May 2, 2017, ALJ Upshall issued an unfavorable decision, (AR 32-52), and on February 6, 2018, the Appeals Council denied Ms. Proano's request for review. (AR 1198-1201, 1204-05.)

Ms. Proano appealed the ALJ's decision to this Court, which remanded the case pursuant to sentence four of 42 U.S.C. § 405(g). (AR 1208-11.) On remand, the Appeals Council vacated ALJ Upshall's decision and remanded the case for another hearing, which ALJ Jennifer Fellabaum held in person on October 21, 2019. (AR 1129-70, 1215-19.) At Ms. Proano's second hearing, at which she was represented by counsel, Ms. Proano, a VE, and Nicole Mara Martinez, Psy.D., testified. (AR 1129-70, 1707-22.) On November 29, 2019, ALJ Fellabaum issued an unfavorable decision. (AR 1097-1118.)

Ms. Proano appealed ALJ Fellabaum's decision to this Court, which remanded based on the ALJ's failure to adequately explain why she discounted the opinions of M. Basel Aswad, M.D., regarding Ms. Proano's non-physical limitations caused by pain, fatigue, and memory loss. (AR 1824-42, 1847-55.) On remand, the Appeals Council vacated the ALJ's decision and remanded the case for a third hearing, which ALJ Fellabaum held telephonically on July 15, 2021. (AR 1233-35, 1794-1823, 1857-59.) At this hearing, at which Ms. Proano was represented by counsel, Ms. Proano and a VE testified. (AR 1794-1823.) On September 15, 2021, ALJ Fellabaum issued the agency's third unfavorable decision, and this appeal followed. (AR 1763-81.)

**B.  Evidence Regarding Ms. Proano's Impairments and Symptoms**

*1.  Medical Record Evidence*

In January 1997, Deming Public Schools evaluated Ms. Proano, who was then a ninth-grader receiving "an extensive level" of special education services. (AR 602.) The evaluation report noted that she had been placed in special education since first grade. (AR 603.) The report indicated that "the most valid estimate of [Ms. Proano's] ability is 87 … based on the Full Scale

WISC III," (AR 605), and concluded that she met the criteria for special education services because her academic achievement was "significantly below age/ability level," with "[s]evere discrepanc[ies]" in reading, math, and written expression. (AR 607.) In an addendum to her Graduation Exit Plan, her IEP team recommended that she be awarded a diploma with a waiver of the New Mexico High School Competency Exam upon completion of her IEP. (AR 633-35.)

Ms. Proano received treatment from Presbyterian Medical Services ("PMS") providers for medical and psychological conditions and symptoms from at least November 2013 to May 2021. (AR 664, 2124.) The medical diagnoses for which she received treatment include:  reactive hypoglycemia or hypoglycemia after gastrointestinal surgery,[5] migraine headaches,[6] iron deficiency anemia,[7] chronic malabsorption issues or intestinal malabsorption,[8]  and, deficiencies in vitamin B-12 and vitamin D.[9] The treatments she received for her medical conditions include: dietary modifications,[10] glucose tablets,[11] sumatriptan,[12] referrals to specialists,[13] blood glucose

---

[5]AR 411, 422, 694, 721, 958, 971, 983.

[6]AR 407, 411, 422, 692, 721, 958, 971.

[7]AR 407, 409, 692, 694, 721, 958, 971, 978.

[8]AR 692, 983.

[9]AR 694.

[10]AR 407, 411, 422, 958.

[11] AR 407.

[12]AR   407,   411,   422.   Sumatriptan,   or   Imitrex,   is   used   to   treat   migraine   headaches. https://medlineplus.gov/druginfo/meds/ a601116.html (last accessed Feb. 7, 2023).

[13]AR 411, 646-47, 721.

monitoring,[14] acarbose,[15] iron supplements,[16]; vitamin D and vitamin B-12 supplements,[17] ondansetron,[18]; and, topiramate.[19]

Psychological diagnoses for which Ms. Proano received treatment from PMS providers include in relevant part:  depression,[20] PTSD,[21] mixed obsessional thoughts and acts,[22] specific reading disorder,[23] OCD,[24] major depressive disorder ("MDD"),[25] cyclothymic disorder,[26] mood disorder,[27] psychophysiological insomnia,[28] and, generalized anxiety disorder ("GAD").[29] The

---

[14]AR 407, 411, 721, 979, 983-84.

[15]AR 422, 983. Acarbose is used to treat diabetes. https://medlineplus.gov/druginfo/meds/a696015.html (last accessed Feb. 7, 2023).

[16]AR 411, 721, 979, 984.

[17]AR 411, 722, 979, 984.

[18]AR 721. Ondansetron, or Zofran, is used to prevent nausea and vomiting. https://medlineplus.gov/druginfo/meds/ a601209.html (last accessed Feb. 7, 2023).

[19]AR 1375, 1466, 1498, 1734, 1737, 1982, 1994, 2000. Topiramate, or Topamax, is used to prevent migraine headaches. https://medlineplus.gov/druginfo/meds/ a697012.html (last accessed Feb. 7, 2023).

[20]AR 721, 971.

[21]AR 28, 731, 735, 740, 747, 753, 760, 772, 777, 785, 788, 1414, 1440, 1445, 1454, 1460, 1463, 1466, 1477, 1482, 1487, 1490, 1728, 1969, 1989, 2013, 2027, 2043, 2051, 2056, 2068, 2077, 2086, 2107, 2130, 2150, 2172, 2184, 2199, 2210, 2217.

[22]AR 28, 1414, 1440, 1445, 1454, 1463, 1477, 1482, 1487, 1490, 1737, 1982, 1994, 2000, 2020.

[23]AR 28, 1440, 1445, 1454, 1463, 1477, 1482, 1487, 1490, 1728, 1969, 1989, 2013, 2027, 2043, 2051, 2056, 2068, 2086, 2107, 2130, 2150, 2172, 2184, 2199, 2210.

[24]AR 731, 747, 753, 772, 788, 1466, 2077, 2217.

[25]AR 28, 731, 772, 785, 788, 1414, 1440, 1445, 1454, 1463, 1477, 1482, 1487, 1490, 1728, 1734, 1737, 1969, 1989, 2013, 2027, 2043, 2051, 2056, 2068, 2076, 2086, 2107, 2130, 2150, 2172, 2184, 2199, 2210, 2217.

[26]AR 735, 740, 747, 753, 760, 777.

[27]AR 1466, 1472, 1498, 1737, 1982, 1994, 2000, 2020.

[28]AR 1737, 1982, 1994, 2000, 2020.

[29]AR 2051, 2056, 2068, 2077, 2086, 2107, 2130, 2199, 2210, 2217.

psychological treatments she received from PMS providers include individual psychotherapy,[30] and prescriptions for about 20 different psychiatric medications,[31] including memantine.[32]

Ms. Proano received medical treatment from endocrinologist Rene Joukhadar, M.D., from April 2014 to March 2016.[33]  Dr. Joukhadar assessed Ms. Proano to have diagnoses including: post-prandial hypoglycemia,[34] iron deficiency anemia,[35] overweight,[36] vitamin D deficiency,[37] vitamin B-12 deficiency,[38] anemia,[39] obesity,[40] complications of gastric bypass surgery,[41] and, postsurgical malabsorption.[42]  The treatments Dr. Joukhadar provided include dietary modifications, blood glucose monitoring, acarbose, vitamin D supplements, vitamin B-12 supplements, iron supplements, glucose, Glucagon emergency kit,[43] recommendation that Ms. Proano have a caregiver present in case of loss of consciousness, that she not drive, that she

---

[30]AR 771, 787, 1420, 1439, 1444, 1453, 1463, 1476, 1481, 1486, 1489, 1968, 1988, 2012, 2026, 2042, 2050, 2055, 2067, 2085, 2106, 2147, 2171, 2183, 2209.

[31]AR 721, 736, 741, 748, 753-54, 760-61, 778, 785-86, 971, 1375, 1461, 1466, 1472, 1498, 1734, 1737, 1982, 1994, 2000, 2020, 2076-77, 2217.

[32]AR 1982, 2000, 2020. Memantine, or Namenda, is used to treat the symptoms of Alzheimer's disease. https://medlineplus.gov/ druginfo/meds/a604006.html (last accessed Feb. 7, 2023).

[33]AR 445, 543.

[34]AR 439, 442, 444, 446, 544, 547, 551, 557, 1514.

[35]AR 439, 442, 444, 446, 544, 547, 551, 557, 1514.

[36]AR 439, 442, 444, 446, 544, 547, 551, 557.

[37]AR 439, 442, 444, 544, 547, 551, 557, 1514.

[38]AR 439, 544, 547.

[39]AR 551, 557, 1514.

[40]AR 1514.

[41]AR 551, 557. Imaging of Ms. Proano's abdomen in May 2014 showed postoperative changes following gastric bypass surgery and cholecystectomy. (AR 459.) Ms. Proano told Dr. Joukhadar that she had had the surgery in Mexico. (*See, e.g.*, AR 439, 441, 446, 544.)

[42]AR 544, 547.

[43]Glucagon injections are "used along with emergency medical treatment to treat very low blood sugar." https://medlineplus.gov/druginfo/meds/a682480.html (last accessed Feb. 7, 2023).

undergo selective arterial calcium stimulation testing at a center with high experience, and that she

consider partial pancreatectomy or gastric bypass reversal.[44]

Ms. Proano received medical treatment from internist, hematologist, and oncologist M.

Basel Aswad, M.D., from May 2014 to May 2021.[45] Dr. Aswad assessed Ms. Proano to have

diagnoses including:  iron deficiency anemia,[46] fatigue,[47] migraine headaches,[48] renal

insufficiency,[49] intractable lower back pain,[50] myelodysplasia,[51] dementia,[52] and, intractable mid

back pain.[53]   The treatments Dr. Aswad provided to Ms. Proano include 33 intravenous iron

infusions between May 2014 and February 2021, each lasting about 90 minutes.[54] Dr. Aswad also

---

[44]AR 439, 442, 444, 446, 544-45, 547, 551, 557, 1508, 1514.

[45]AR 597, 2237.

[46]AR 582, 585, 588, 591, 594, 597, 1618, 1637, 1640, 1643, 1646, 1649, 1652, 1655, 1658, 1662, 1665, 1667, 1670, 1672, 1675, 1678, 1681, 1685, 1688, 1691, 1694, 1697, 1700, 1703, 1706, 1751, 1754, 1757, 2234, 2236, 2238, 2241, 2243, 2246, 2249, 2251, 2253, 2258, 2261, 2264, 2266, 2268, 2270.

[47]AR 582, 585, 588, 591, 594, 597, 1618, 1637, 1640, 1643, 1646, 1649, 1652, 1655, 1658, 1662, 1665, 1670, 1672, 1675, 1678, 1681, 1685, 1688, 1691, 1694, 1697, 1700, 1703, 1706, 1751, 1754, 1757, 2234, 2236, 2238, 2241, 2243, 2246, 2249, 2251, 2253, 2258, 2261, 2264, 2266, 2268, 2270.

[48]AR 582, 585, 588, 591, 594, 597, 1618, 1670, 1672, 1675, 1678, 1681, 1685, 1688, 1700, 1703, 1706, 1751, 1754, 1757, 2234, 2236, 2238, 2241, 2243, 2246, 2249, 2251, 2253, 2258, 2261, 2264, 2266, 2268, 2270.

[49]AR 1637, 1640, 1643, 1646, 1649, 1652, 1655, 1658, 1662, 1665, 1667, 1670, 1672, 1675, 1678, 1681, 1685, 1688, 1691, 1694, 1697, 1700, 1703, 1706, 1751, 1754, 1757, 2234, 2236, 2238, 2241, 2243, 2246, 2249, 2251, 2253, 2258, 2261, 2264, 2266, 2268, 2270.

[50]AR 1637, 1640, 1670, 1672, 1675, 1678, 1681, 1685, 1688, 1691, 1694, 1697, 1700, 1703, 1706, 1751, 1754, 1757, 2234, 2236, 2238, 2241, 2243, 2246, 2249, 2251, 2253, 2258, 2261, 2264, 2266, 2268, 2270.

[51]AR 1670, 1672, 1675, 1678, 1681, 1685, 1688, 1691, 1694, 1697, 1700, 1703, 1706, 1751, 1754, 1757, 2234, 2236, 2238, 2241, 2243, 2246, 2249, 2251, 2253, 2258, 2261, 2264, 2266, 2268, 2270. "Myelodysplastic syndromes are a group of disorders caused by blood cells that are poorly formed or don't work properly."https://www.mayoclinic.org/diseases-conditions/myelodysplastic-syndrome/symptoms-causes/syc-20366977 (last accessed February 8, 2023).

[52]AR 1754, 1757, 2241, 2243, 2258, 2261, 2264.

[53]AR 1751, 2234, 2236, 2238, 2241, 2243, 2246, 2249, 2251, 2253, 2258, 2261, 2264, 2266, 2268, 2270.

[54]AR 583, 586, 589, 592, 595, 1641, 1644, 1647, 1650, 1653, 1656, 1660, 1663, 1668, 1673, 1676, 1679, 1683, 1686, 1689, 1692, 1695, 1698, 1701, 1704, 1748, 1752, 1755, 2244, 2247, 2256, 2259, 2262.

prescribed medications including:  zolpidem,[55] metoclopramide,[56] topiramate,[57] valproic acid,[58] prochlorperazine,[59] donepezil,[60] Fioricet,[61] ondansetron,[62] memantine,[63] iron supplements,[64] and blood glucose monitoring.[65] Dr. Aswad also administered intravenous epoetin alfa.[66]

Dr. Aswad gave Ms. Proano steroid injections in her lower and mid back,[67] and instructed her not to lift weight or engage in strenuous activity that might exacerbate her pain.[68] In addition, he recommended dietary modifications,[69] administered intravenous ondansetron,[70] referred Ms.

---

[55] AR 588, 591. Zolpidem, or Ambien, is used to treat insomnia. https://medlineplus.gov/druginfo/meds/a693025.html (last accessed Feb. 8, 2023).

[56] AR 1643, 1646, 1649, 1652, 1655, 1658, 1662. Metoclopramide, or Reglan, is used to relieve nausea, vomiting, heartburn, and loss of appetite. https:// medlineplus.gov/druginfo/meds/a684035.html (last accessed Feb. 8, 2023).

[57] AR 1637, 1640, 1643, 1691, 1694, 1697, 2238, 2241, 2243, 2246, 2249.

[58] AR 1670, 1672, 1675, 1681, 1685, 1688, 1700, 1703, 1706, 1751, 1754, 1757, 2234, 2236, 2249, 2251, 2253, 2258, 2264, 2266, 2268, 2270. Valproic acid, or Depakote, is used medically to prevent migraine headaches. https://medlineplus.gov/druginfo/ meds/a682412.html (last accessed Feb. 8, 2023).

[59] AR 1670, 1672, 1675, 1678, 1700, 1703, 1706, 1751, 1754, 1757. Prochlorperazine, or Compazine, is used to treat severe nausea and vomiting. https://medlineplus.gov/ druginfo/meds/a682116.html (last accessed Feb. 8, 2023).

[60] AR 1700, 1751, 1754, 1757, 2238, 2246, 2249, 2251, 2253, 2258, 2261, 2264, 2266. Donepezil, or Aricept, is used to treat dementia. https://medlineplus.gov/druginfo/meds/a697032.html (last accessed Feb. 8, 2023).

[61] AR 1751, 1754, 1757, 2238, 2241, 2243, 2246, 2249, 2251, 2253. Fioricet is a combination of acetaminophen, Butalbital, and caffeine, and is used to relieve headaches. https://medlineplus.gov/druginfo/meds/a601009.html (last accessed Feb. 8, 2023).

[62] AR 2236, 2238, 2241, 2243, 2246, 2249.

[63] AR 2234, 2236, 2238, 2241, 2243, 2246, 2249, 2251, 2253, 2258, 2261, 2264, 2266, 2268, 2270.

[64] AR 2241, 2243, 2246, 2249, 2251, 2253, 2258, 2261, 2264, 2266, 2268, 2270.

[65] AR 2268.

[66] AR 1697. Epoetin alfa, or Procrit, is used to treat anemia. https://medlineplus.gov/druginfo/meds/a692034.html (last accessed Feb. 8, 2023).

[67] AR 1638, 1682, 1749.

[68] AR 1637, 1640, 1670, 1672, 1675, 1678, 1681, 1685, 1688, 1691, 1694, 1697, 1700, 1703, 1706, 1751, 1754, 1757, 2234, 2236, 2258, 2261, 2266, 2270.

[69] AR 1646, 1652, 2266, 2268.

[70] AR 1676.

Proano to endocrinology,[71] and ordered an MRI of Ms. Proano's brain.[72] Interpreting the MRI Dr. Aswad ordered, Lance Dell, M.D., found "[m]inimal white matter change suggesting microvascular disease." (AR 1561.) Dr. Dell added that "[t]his is somewhat notable considering [the] age [of] the patient. Additional cortical atrophic findings are present." (AR 1561.)

Ms. Proano also received medical and psychological treatment from other providers for shorter periods of time. Ms. Proano received individual psychotherapy and psychiatric medications for bipolar disorder, OCD, and GAD,[73] from providers at Border Area Mental Health Services, Inc., from November 2012 to January 2013.[74] She received intravenous iron infusions for iron deficiency anemia from hematologist Shravan Narmala, M.D., between August and November 2015.[75] She saw providers at Ben Archer Health Center from September 2015 to October 2016, for conditions including headaches, nausea, anemia, iron deficiency, fatigue, sciatica, OCD, and MDD, and received treatment including individual psychotherapy and a ketorolac injection for headache.[76] Ms. Proano saw providers at Silver Health CARE Deming for migraine headaches, iron deficiency anemia, hypoglycemia, and memory change in March and July 2016, and received referrals to specialists.[77] She saw Thomas Hanson, M.D., for post-prandial hypoglycemia in

---

[71]AR 2246.

[72]AR 1678.

[73]AR 375.

[74]AR 345-92.

[75]AR 705-06, 714-15.

[76]AR 793-855. Ketorolac, or Toradol, is used to relieve moderately severe pain. https://medlineplus.gov/druginfo/meds/ a614011.html (last accessed Feb. 8, 2023).

[77]AR 568-74.

January 2017.[78] Dr. Hanson prescribed phenytoin as "a drug trial for post-bariatric hypoglycemia."[79] (AR 1031.)

In October 2015, Kathleen Slee, LMSW, in coordination with treating providers Dr. Joukhadar and Randy Lenhardt, CNP, developed an Individual Care Plan for Ms. Proano, requesting caregiver assistance with bathing, dressing, grooming, meal preparation, feeding, housework, laundry, shopping, ambulation, repositioning, transportation, and finances.[80] LMSW Slee opined that "these services are needed for the health and welfare of" Ms. Proano. (AR 1528.) Ms. Proano received home health care services from Presbyterian Centennial Care and Addus Home Care from October 2015 to September 2017 due to hypoglycemia.[81] Approved services included help with bathing, shaving, dressing, nail care, skin care, meal planning, meal preparation, housekeeping, and running errands, as well as standby safety.[82] Ms. Proano had a plan of care for similar services from Ambercare from October 2020 to September 2021.[83] In addition, from January 2016 to May 2021, Ms. Proano received help from MaryLou Lozano, CSW, in accessing medical and professional services, public benefits, and community resources.[84]

Randall Rattan, Ph.D., performed a consultative psychological examination of Ms. Proano in November 2014.[85] He calculated her full-scale IQ as 51 and diagnosed her with MDD and Mild

---

[78]AR 1029-32.

[79]Phenytoin, or Dilantin, is generally used to treat seizures. https://medlineplus.gov/druginfo/meds/a682022.html (last accessed Feb. 8, 2023).

[80]AR 1517-28.

[81]AR 1050-70.

[82]AR 1050-70.

[83]AR 2230-31.

[84]AR 743, 755, 762, 768, 790, 1408, 1416, 1418, 1422, 1433, 1435, 1437, 1442, 1447, 1449, 1451, 1469, 1474, 1479, 1484, 1492, 1971, 1977, 1979, 2006, 2035, 2038, 2040, 2048, 2058, 2070, 2096, 2111, 2124, 2152, 2162.

[85]AR 464-69.

Intellectual Disability.[86] Steven K. Baum, Ph.D., performed a consultative psychological examination of Ms. Proano in February 2018.[87] He calculated her full-scale IQ as 54 and diagnosed her with schizophrenia, depression, PTSD, and mental retardation with learning disabilities.[88]

### 2. Reports, Statements, and Testimony

On August 30, 2014, Ms. Proano completed an Adult Function Report with help from her husband, who is not an English speaker.[89] She later testified that she did not understand the form and her husband probably did not either.[90] In response to the prompt, "Describe what you do from the time you wake up until going to bed," she wrote, verbatim, "I have 2 kid I take care of my kid I try to rember thing to do in a daily to I can have some thing to do it very heard try to do thing all not rembering want to do xlot now it it right." (AR 273.) Throughout the report, it appears that Ms. Proano did not fully understand the prompts, and she made significant mistakes expressing herself in writing.[91] She did report that she could prepare sandwiches and frozen food, do cleaning and laundry, drive "sometime" if needed, pay bills, and count change. (AR 275-76.) But she also reported that she could not handle a savings account or use a checkbook or money orders, was "all way's sleep tired," needs someone to accompany her to go places, "need to wright very thing down," can only pay attention for five minutes, and "[a]ll the time need to have written instructions to rember." (AR 276-78.) In conclusion, Ms. Proano wrote, verbatim:

> I have hypoglycemia and I don't eant my surger drop to 32" 54" it make me feel
> very bad I can't relly do anything about it becuse it happen when After I eat any

---

[86] AR 468.

[87] AR 1086-89.

[88] AR 1088.

[89] AR 85-86, 273-80. Ms. Proano's husband was incarcerated in November 2015 and subsequently deported. (*See, e.g.,* AR 841, 1408, 2129.)

[90] AR 86.

[91] AR 273-80.

thing I can't control it I faint becuse low surger level It take me very long to do thing becuse I for get a lot I I dot't rember thing.

(AR 280.)

On October 24, 2014, Ms. Proano completed a Headache Questionnaire, in which she indicated that "very day" she has migraines that cause eye pain, blurred vision, pain on the side of her head and face, neck pain, nausea, and dizziness, and are worse with light or noise. (AR 303.) She indicated that the migraines cause her "trouble take care of my some time do to light – sound" and that she takes "Tylonal" and "Ibrofer" for them. (AR 303.)

On March 8, 2017, Leticia Ortiz attested that she cooks, cleans, does dishes and laundry, runs errands, and provides transportation for Ms. Proano, helps her with personal care, reminds her about doctors' appointments and medications, and cares for her infant.[92] She noted that Ms. Proano naps two to three hours every other day, has to snack continuously, and "often faints or passes out." (AR 1073.) She also wrote that Ms. Proano is obsessive about having a clean floor, gets a severe migraine every other day, and has trouble remembering and following simple instructions.[93]

At her March 13, 2017 hearing, Ms. Proano testified that, when she worked part-time helping medical assistants at Presbyterian for one to two months in 2014, she was laid off because she fainted and was deemed a liability.[94] She also testified that when she worked as a cashier and cleaner before her alleged onset date, she was laid off because she had "disability giving change back, understanding." (AR 69-72.) She added that when she worked sanding wood for cabinet

---

[92]AR 1073-74.

[93]AR 1073-74.

[94]AR 68, 82.

making, she was laid off because she could not keep up with the pace, and when she worked part-time as a greeter for Wal-Mart, she left because she panicked from being around so many people.[95]

According to Ms. Proano's testimony at her March 2017 hearing, she gets low blood sugar daily, has passed out "[w]here [she's] gone to emergencies" twice, and passed out totally about once a month until a year and a half before the hearing. (AR 73-75.) She indicated that she has also had low blood sugar that caused her to almost pass out since the time she fainted at Presbyterian in 2014. (AR 76.) She added that she needs an injection or "something sweet" once a day to raise her blood sugar because she "lose[s] function." (AR 88.)

Ms. Proano testified that she was waiting for insurance approval to have her pancreas removed and a care coordinator was helping her with that.[96] She stated that her medications cause "really bad sweats" and drowsiness such that she "can't function." (AR 80-81.) According to Ms. Proano, her caregiver cooks, cleans, bathes her, lives with her, gives her shots when her blood sugar is low, feeds and dresses her children, watches her toddler, reminds her of medications and appointments, pays bills, and drives her places.[97] She testified that she has daily migraines and anxiety about being around people and being unable to perform tasks, can only read and write "basic words," and does math "very bad[ly]." (AR 84-87.)

At Ms. Proano's October 21, 2019 hearing, Dr. Martinez, a non-examining psychologist, testified from her records review that Ms. Proano has MDD, various anxiety disorders, PTSD, and

---

[95]AR 69-70. In her decision, the ALJ several times relied on Ms. Proano's past work history to find that she had no more than moderate limitations. (AR 1769-70, 1774.) In doing so, however, the ALJ failed to acknowledge or discuss Ms. Proano's testimony that she was "laid off" from or left many of the jobs the ALJ asked her about due to her impairments. (AR 68-72, 1151, 1803-04, 1811-12.)

[96]AR 78-79.

[97]AR 82-84.

a specific learning disability in reading and writing.[98] She opined that Ms. Proano can: (1) handle simple information though detailed information "could be more of an issue"; (2) occasionally interact with the public; and, (3) concentrate, persist, and maintain pace at simple work for two-hour segments; but, (4) has a marked limitation in adapting and managing herself. (AR 1145-46.) She added that Ms. Proano cannot perform fast-paced production work or tandem tasks and should be limited to routine work with occasional changes in the work environment.[99] Dr. Martinez also opined that the findings on Ms. Proano's brain MRI would have no impact on IQ and were "not notable in terms of significant findings of early Alzheimer's or dementia." (AR 1149.)

At her October 2019 hearing, Ms. Proano testified that her blood sugar drops every day to every other day, which leaves her exhausted, unable to concentrate, and very nauseous, and causes her to see spots.[100] According to Ms. Proano, it takes four hours after she takes a glucose tablet for the fatigue to go away.[101] She added that after she eats she gets "really sick," becomes shaky, and cannot concentrate. (AR 1159-60.) She also said she gets headaches daily, and takes Topamax every other day, which helps with pain but not noise or light sensitivity.[102]

Ms. Proano testified that she was laid off cabinet work because she "didn't know how to read a measuring tape." (AR 1151.) She indicated that she sometimes cannot get intravenous iron infusions because she is waiting for approval from insurance, and that her insurance would not pay for surgery her doctor suggested.[103] She stated that her caregiver helps her with cooking, cleaning,

---

[98]AR 1137, 1140-42, 1145.

[99]AR 1146.

[100]AR 1151.

[101]AR 1152.

[102]AR 1154-55.

[103]AR 1153.

shopping, and putting appointments in her phone, and she also gets a lot of support from her parents in caring for her children.[104]

Finally, at her July 15, 2021 hearing, Ms. Proano testified that her low blood sugar causes fatigue, sweating, and loss of concentration and focus, and that she takes glucose tablets every day and has to "graze" all day to keep her blood sugar up. (AR 1804-05, 1811.) She added that the fatigue affects her ability to remember and do daily chores. (AR 1812.) She also indicated that she gets headaches almost every day and "just can't be around people." (AR 1806-08.)

According to Ms. Proano, she receives 18 hours of caregiver help per week and receives assistance with shopping, appointments, medications, laundry, and food preparation.[105] She stated that her caregiver puts her medications in pill containers and sets reminders on her phone for her to take them.[106] Ms. Proano testified that she struggles with reading and writing and only uses a microwave to heat food because she almost caused a serious fire by forgetting she was cooking.[107] She further indicated that she sometimes misses medical appointments because she cannot get a ride or forgets them.[108]

### 3. Medical Source Opinions and Prior Administrative Medical Findings

On November 14, 2014, Dr. Rattan opined that Ms. Proano "appears not fully and reliably capable of carrying out basic instructions and exhibiting contextually appropriate behavior," and "would have marked difficulty maintaining consistent employment … particularly for jobs that require frequent social interaction." (AR 468.) He also opined that she is "not capable of managing

---

[104]AR 1155-56, 1158, 1163.

[105]AR 1808-10.

[106]AR 1808-10.

[107]AR 1809, 1814.

[108]AR 1815.

finances." (AR 469.) He "deferred to a medical provider" regarding Ms. Proano's deficits related to anemia and hypoglycemia. (AR 468.)

On November 21, 2014, non-examining state agency consultant Mark Werner, M.D., opined that Ms. Proano should never climb ladders, ropes, or scaffolds, and should avoid exposure to hazards such as machinery and heights due to reactive hypoglycemia.[109] On April 6, 2015, T. Bessent, M.D., opined to the same physical limitations.[110]

On December 4, 2014, non-examining state agency consultant Scott Walker, M.D., opined that Ms. Proano is moderately limited in the abilities to:

- understand, remember, and carry out detailed instructions;
- maintain attention and concentration for extended periods;
- perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;
- sustain an ordinary routine without special supervision;
- work in coordination with or proximity to others without being distracted by them;
- complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods;
- interact appropriately with the general public;
- accept instructions and respond appropriately to criticism from supervisors;
- get along with coworkers or peers without distracting them or exhibiting behavioral extremes;
- respond appropriately to changes in the work setting;
- travel in unfamiliar places or use public transportation; and,
- set realistic goals or make plans independently of others.

(AR 109-11, 123-24.)

On February 20, 2015, Dr. Joukhadar opined that Ms. Proano needs someone "at her disposal" who can quickly help her manage her hypoglycemia by helping her to take oral glucose

---

[109]AR 107-08, 121-22.

[110]AR 138-39, 153-54.

if conscious or calling emergency services and giving her a Glucagon injection if unconscious.

(AR 471.)

On March 27, 2015, non-examining state agency consultant J. Tendler, M.D., opined that

Ms. Proano:

- "should not be exposed [sic] to memorize or understand detailed instructions" but "can understand and memorize simple ones" and "is able to understand, remember, and carry out a two-step command involving simple instructions," (AR 140, 155);

- "can concentrate and maintain persistence on simple tasks," "complete tasks consisting of 1-2-3 step instructions," "maintain extended periods of concentration and attention greater than 2-hour segments," and "maintain attendance and complete a normal workweek and maintain pace with occasional absences/disruptions due to psychological symptoms," (AR 141, 156);

- is "[s]ocially available for superficial interactions" and "[a]ble to relate to coworkers [and] supervisors but would have difficulty relating to the public on a regular basis," (AR 141, 156); and,

- "can maintain an acceptable level of attendance" and "adequately adapt to changes of routine, and to simple situations, not calling for rapid or extensive changes in work tasks or procedures."

(AR 141, 156.)

On February 24, 2016, Troy Hill, LMFT, opined that Ms. Proano is markedly limited in

the abilities to:

- understand, remember, and carry out detailed instructions;
- maintain attention and concentration for two-hour segments;
- work in coordination with or proximity to others without being distracted by them;
- complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace without an unreasonable number and length of rest periods;
- accept instructions and respond appropriately to criticism from supervisors;
- get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and,
- travel in unfamiliar places or use public transportation.

(AR 505-06, 1077.) He also opined that Ms. Proano is moderately limited in the abilities to:

17

- understand, remember, and carry out very short and simple instructions;
- perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance;
- sustain an ordinary routine without special supervision;
- make simple work-related decisions;
- interact appropriately with the general public;
- maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness;
- respond appropriately to changes in the work place;
- be aware of normal hazards and take adequate precautions; and,
- set realistic goals or make plans independently of others.

(AR 505-06, 1077.)

A year later, LMFT Hill opined that Ms. Proano is markedly limited in the abilities to:

- carry out detailed instructions;
- maintain attention and concentration for two-hour segments;
- perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance;
- sustain an ordinary routine without special supervision;
- work in coordination with or proximity to others without being distracted by them;
- complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace without an unreasonable number and length of rest periods;
- get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and,
- respond appropriately to changes in the workplace.

(AR 1044-45.) He further opined that Ms. Proano is moderately limited in the abilities to:

- understand and remember detailed instructions;
- carry out very short and simple instructions;
- make simple work-related decisions;
- interact appropriately with the general public;
- ask simple questions or request assistance;
- accept instructions and respond appropriately to criticism from supervisors;
- be aware of normal hazards and take adequate precautions;
- travel in unfamiliar places or use public transportation; and,
- set realistic goals or make plans independently of others.

(AR 1044-45.)

On December 12, 2017, Dr. Baum opined that Ms. Proano has marked limitations in the abilities to:

- understand, remember, and carry out detailed instructions;
- maintain attention and concentration for two-hour segments;
- perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance;
- complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace without an unreasonable number and length of rest periods;
- accept instructions and respond appropriately to criticism from supervisors;
- get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and,
- set realistic goals or make plans independently of others.

(AR 17-18.) Dr. Baum also opined that Ms. Proano is moderately limited in the abilities to:

- remember locations and work-like procedures;
- understand, remember, and carry out very short and simple instructions;
- sustain an ordinary routine without special supervision;
- work in coordination with or proximity to others without being distracted by them;
- make simple work-related decisions;
- interact appropriately with the general public;
- ask simple questions or request assistance; and,
- travel in unfamiliar places or use public transportation.

(AR 17-18.)

On February 8, 2018, Dr. Baum opined that Ms. Proano is severely limited in the abilities to:

- understand and remember detailed or complex instructions;
- carry out instructions;
- attend and concentrate;
- work without supervision;
- interact with the public, coworkers, and supervisors; and,
- use public transportation or travel to unfamiliar places.

(AR 1089.) Dr. Baum further opined that Ms. Proano is moderately to severely limited in the ability to understand and remember very short and simple instructions, and mildly to moderately limited in the abilities to adapt to changes in the workplace and to be aware of normal hazards in the

workplace. (AR 1089.)  On June 21, 2019, Dr. Aswad concurred with Dr. Baum's opinions, as did treating provider Sandtina Melendrez, LMSW, on July 10, 2019.[111]

On April 23, 2019, LMSW Melendrez opined that Ms. Proano is markedly limited in the abilities to:

- understand, remember, and carry out detailed instructions;
- maintain attention and concentration for two-hour periods;
- sustain an ordinary routine without special supervision;
- work in coordination with or proximity to others without being distracted by them;
- complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace without an unreasonable number and length of rest periods;
- travel in unfamiliar places or use public transportation; and,
- set realistic goals or make plans independently of others.

(AR 1501-02.) LMSW Melendrez also opined that Ms. Proano is moderately limited in the abilities to:

- remember locations and work-like procedures;
- perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance;
- interact appropriately with the general public;
- accept instructions and respond appropriately to criticism from supervisors; and,
- respond appropriately to changes in the work place.

(AR 1501-02.)

Finally, on August 28, 2019, Dr. Aswad opined that Ms. Proano:

- can occasionally lift and/or carry less than ten pounds;
- can frequently lift and/or carry less than five pounds;
- can stand and/or walk less than two hours in an eight-hour workday;
- must periodically alternate sitting and standing to relieve pain or discomfort;
- can occasionally reach, handle, finger, push, pull, and keyboard; and,
- can never kneel, stoop, crouch, or crawl.

---

[111]AR 1506, 1563.

(AR 1570.) Dr. Aswad also opined that, due to her impairments, injuries, sicknesses, pain, and/or fatigue, Ms. Proano has marked limitations in the abilities to:

- maintain attention and concentration for two-hour periods;
- maintain regular attendance and be punctual within customary tolerance;
- maintain physical effort for long periods without a need to decrease activity or pace, or to rest intermittently; and,
- complete a normal workday and workweek without interruptions from pain or fatigue and perform at a consistent pace without an unreasonable number and length of rest periods.

(AR 1571.) Dr. Aswad further opined that she is moderately limited in the ability to perform activities within a schedule. (AR 1571.)

### C.  The ALJ's Decision

In the decision under review, ALJ Fellabaum applied the Commissioner's five-step evaluation process.[112] (AR 1766-81.) At step one, the ALJ determined that Ms. Proano has not engaged in substantial gainful activity since her alleged onset date. (AR 1768.) At step two, the ALJ found that Ms. Proano has the severe impairments of intellectual disorder, specific learning disorder in reading, depression, anxiety, OCD, PTSD, post-prandial hypoglycemia, iron deficiency anemia, migraines, and sciatica. (AR 1769.) The ALJ also determined that Ms. Proano's obesity and thyroid nodules are non-severe. (AR 1769.) At step three, the ALJ found that Ms. Proano's

---

[112]The five-step sequential evaluation process requires the ALJ to determine whether:

(1)     the claimant engaged in substantial gainful activity during the alleged period of disability;
(2)     the claimant has a severe physical or mental impairment (or combination of impairments) that meets the duration requirement;
(3)     any such impairment meets or equals the severity of a listed impairment described in Appendix 1 of 20 C.F.R. Part 404, Subpart P;
(4)     the claimant can return to her past relevant work; and, if not,
(5)     the claimant is able to perform other work in the national economy, considering her residual functional capacity, age, education, and work experience.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the burden of proof in the first four steps of the analysis and the Commissioner has the burden of proof at step five. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A finding that the claimant is disabled or not disabled at any point in the process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

impairments, alone or in combination, do not meet or medically equal the severity of one of the Listings described in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (AR 1769-71.)

At step four,[113] the ALJ found that Ms. Proano has the residual functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally stoop, crouch, kneel, crawl, balance, and climb ramps and stairs. She can never climb ladders, ropes, or scaffolds, or be exposed to unprotected heights, hazardous machinery, or concentrated exposure to environmental irritants. She cannot operate a motor vehicle for commercial purposes. She can frequently finger and handle bilaterally. The noise level of the work environment should be moderate or less. She can perform simple, routine tasks, with GED levels in math, language and reasoning of no greater than 2. She cannot perform fast paced production work. She can make simple work decisions. Her work should be performed in the same location every day. She can occasionally interact with co-workers, supervisors, and the general public, with no team tasks or tandem work.

(AR 1771-72.) The ALJ also found that Ms. Proano is unable to perform any of her past relevant work. (AR 1779.)

At step five, the ALJ found that there is other work Ms. Proano can perform that exists in significant numbers in the national economy. (AR 1780.) In making this determination, the ALJ relied on VE testimony that a hypothetical individual of Ms. Proano's age and with her education, work experience, and assigned RFC could perform the representative occupations of folder, office helper, sorter, final assembler, address clerk, and table worker. (AR 1780.) The ALJ therefore concluded that Ms. Proano "has not been under a disability, as defined in the Social Security Act, from April 1, 2013, through the date of this decision." (AR 1780.)

---

[113]Step four involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ must consider all of the relevant evidence and determine what is "the most [the claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is the claimant's residual functional capacity. *Id.* Second, the ALJ must determine the physical and mental demands of the claimant's past work. *Winfrey*, 92 F.3d at 1023. Third, the ALJ must determine whether the claimant is capable of meeting those demands given her residual functional capacity. *Id.* A claimant who can perform her past relevant work is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f).

## II.  STANDARD OF REVIEW

The Court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).

The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record. *Hamlin*, 365 F.3d at 1214. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). It is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley*, 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks and brackets omitted). Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate

that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting [her] decision, the ALJ also must discuss the uncontroverted evidence [she] chooses not to rely upon, as well as significantly probative evidence [she] rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out [her] specific findings and [her] reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

## III. DISCUSSION

Ms. Proano argues that, in her September 2021 RFC assessment, the ALJ failed to follow this Court's December 2020 mandate and again failed to provide adequate reasons for rejecting Dr. Aswad's opinions regarding Ms. Proano's non-exertional limitations. (Doc. 22 at 7-15.) Ms. Proano also argues that the ALJ improperly picked and chose among the moderate limitations to which Dr. Walker opined, (*id.* at 15-17), and improperly rejected the opinions of LMFT Hill and LMSW Melendrez. (*Id.* at 18-23.) Finally, Ms. Proano argues that the ALJ failed to properly account for her subjective allegations of fatigue and other symptoms of anemia and hypoglycemia. (*Id.* at 23-27.) For the reasons discussed below, the Court finds that remand is warranted because, in assessing Ms. Proano's RFC, the ALJ again failed to adequately explain her rejection of Dr. Aswad's opinions regarding Ms. Proano's ability to perform non-physical work activities.[114]

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional."[115] *Hamlin*, 365 F.3d at 1215 (citation omitted). When the opinion at issue

---

[114]The Court will not address Ms. Proano's remaining claims of error because they may be affected on remand. *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

[115]The agency has issued revised regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). However, because Plaintiff filed her claims in 2014, the previous regulations still apply to this matter.  (AR 100, 114.)

is that of the claimant's treating physician, the ALJ must first consider "whether the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with the other substantial evidence in the record." *Allman v. Colvin*, 813 F.3d 1326, 1331 (10th Cir. 2016) (quoting *Pisciotta v. Astrue,* 500 F.3d 1074, 1077 (10th Cir. 2007)). "If so, the ALJ must give the opinion controlling weight."[116]  *Id.*

Moreover, even if a treating physician's medical opinion is not entitled to controlling weight, it is "still entitled to deference" and the ALJ must decide what weight, if any, to give it. *Oldham v. Astrue,* 509 F.3d 1254, 1258 (10th Cir. 2007); *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004). Relevant factors the ALJ should consider are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Allman*, 813 F.3d at 1331-32; *Oldham*, 509 F.3d at 1258; *Robinson*, 366 F.3d at 1082; *Watkins v. Barnhart,* 350 F.3d 1297, 1301 (10th Cir. 2003).

Although she need not specifically address each of the above factors, "an ALJ must give good reasons … for the weight assigned to a treating physician's opinion." *Allman*, 813 F.3d at 1332; *Langley,* 373 F.3d at 1119. These reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and

---

[116]"A physician's opinion is deemed entitled to special weight as that of a 'treating source' when he has seen the claimant a number of times and long enough to have obtained a longitudinal picture of the claimant's impairment, taking into consideration the treatment the source has provided and the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories." *Doyal v. Barnhart*, 331 F.3d 758, 763 (10th Cir. 2003) (quotation marks and brackets omitted).

the reason for that weight." *Allman*, 813 F.3d at 1332; *Oldham*, 509 F.3d at 1258; *Langley*, 373 F.3d at 1119. Moreover, "[i]f the ALJ rejects the opinion completely, [she] must then give specific, legitimate reasons for doing so." *Allman*, 813 F.3d at 1332; *Langley*, 373 F.3d at 1119; *Robinson*, 366 F.3d at 1082.

> In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion.

*Langley*, 373 F.3d at 1121 (emphasis omitted) (quoting *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002)); *Robinson*, 366 F.3d at 1082.

In addition, "when a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports to see if they outweigh the treating physician's report, not the other way around." *Hamlin*, 365 F.3d at 1215 (brackets omitted). "The treating physician's opinion is given particular weight because of his unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."[117] *Id.*; *Robinson*, 366 F.3d at 1084 (quotation marks omitted).

In this case, the Court has already concluded, and the Commissioner does not dispute, that Dr. Aswad is Ms. Proano's treating physician. (AR 1824-42, 1847-55; Doc. 25 at 11-14.) Among other things, Dr. Aswad opined that, due to Ms. Proano's impairments, injuries, sicknesses, pain, and/or fatigue, she is markedly limited in the abilities to: (a) maintain attention and concentration for two-hour periods; (b) maintain regular attendance and be punctual within customary tolerance;

---

[117]"The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." *Robinson*, 366 F.3d at 1084.

(c) maintain physical effort for long periods without a need to decrease activity or pace, or to rest intermittently; and, (d) complete a normal workday and workweek without interruptions from pain or fatigue and perform at a consistent pace without an unreasonable number and length of rest periods. (AR 1571.) Dr. Aswad further opined that she is moderately limited in the ability to perform activities within a schedule. (AR 1571.)

In the decision under review, the ALJ gave Dr. Aswad's opinions "little weight," effectively rejecting them. (AR 1778.); *see Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (equating "'according little weight to'" a medical source opinion with "effectively rejecting" it).[118] The ALJ gave the following reasons for rejecting Dr. Aswad's opinions: (1) Dr. Aswad "provided no explanation" to support his opinions; (2) "there are no physical examinations that show this level of impairment"; (3) "mental status examinations do not show any marked limitations" and "have been generally within normal limits"; (4) Dr. Martinez opined that Ms. Proano's brain MRI "would not support a finding of dementia or a significant drop in the claimant's IQ," and there is "no objective evidence of dementia or severe cognitive deficits"; and, (5) "[t]he opinions are … inconsistent with Dr. Aswad's own treatment records reflecting generally normal physical and

---

[118]Courts in this circuit have often interpreted *Chapo*'s language to mean that, universally, according a medical opinion "little weight" is effectively rejecting that opinion. *Martinez v. Saul*, No. 18-cv-1196, 2019 WL 4346311, at *3 (D.N.M. Sept. 12, 2019); *Perea v. Berryhill*, No. 17-cv-401, 2018 WL 3405257, at *7 & n.24 (D.N.M. July 12, 2018); *see also, e.g.*, *Quintero v. Colvin*, 567 F. App'x 616, 620 n.6 (10th Cir. 2014) ("Although the ALJ actually stated she assigned the opinion 'little, if any weight' rather than outright rejecting it, we have recognized such statements operate as the equivalent of a rejection of the opinion."); *Sanchez v. Saul*, No. 18-cv-1214, 2020 WL 1236607, at *4 n.6 (D.N.M. Mar. 13, 2020) ("The ALJ afforded 'little weight' to Dr. Hughson's opinions, thereby 'effectively rejecting' them under Tenth Circuit law."); *but see Dunn v. Colvin*, No. 14-cv-759, 2015 WL 1756126, at *5 (D. Colo. Apr. 15, 2015) (declining to equate "little weight" with "rejection" notwithstanding *Chapo* where it was "patently clear that the ALJ did *not* fully reject Dr. Quintana's opinion but, rather, merely gave it little weight") (emphasis in original). Here, the Court need not decide whether an ALJ's assignment of "little weight" to an opinion can ever constitute something other than effective rejection, because it does not appear that the ALJ accounted for any of Dr. Aswad's opinions regarding Ms. Proano's non-exertional limitations in assessing her RFC.

neurological examinations with no reference to severe psychiatric symptoms or cognitive deficits."[119] (AR 1778-79.)

As explained below, the ALJ's stated reasons for rejecting Dr. Aswad's opinions regarding Ms. Proano's non-exertional limitations are inadequate. First, the form on which Dr. Aswad documented these opinions indicates that the opinions are based on "the patient's medical history and the chronicity of findings as [of] 2016 to current examination," and are supported by medical "observations" and "records." (AR 1571 (emphasis omitted).) And, the administrative record contains Dr. Aswad's notes from about 50 appointments with Ms. Proano over seven years, recording Ms. Proano's reported symptoms and Dr. Aswad's objective findings, diagnoses, and treatment, including 33 intravenous iron infusions to treat chronic iron deficiency anemia and prescription medication to treat chronic migraine headaches and early dementia. (AR 581-97, 1617-18, 1636-1706, 1750-57, 2233-70.) In other words, the record includes considerable documentation of the reasons for Dr. Aswad's opinions, and the ALJ's conclusion to the contrary is not supported by substantial evidence. (AR 1778); *see Pickup v. Colvin*, 606 F. App'x 430, 433 (10th Cir. 2015) (ALJ's conclusion was not supported by substantial evidence where it was belied by a letter in the record); *Stills v. Astrue*, 476 F. App'x 159, 161 (10th Cir. 2012) (agency's reasoning was not supported by substantial evidence where it was "incorrect").

---

[119]The ALJ did not expressly address the first step of the treating physician analysis in considering Dr. Aswad's opinions, *i.e.*, she did not directly state whether she found his opinions to be well supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with the other substantial evidence in the record, and therefore entitled to controlling weight. (*See* AR 1778); *Allman*, 813 F.3d at 1331. However, Plaintiff does not argue that the ALJ erred by failing to address this step, (*see generally* Docs. 22, 26); and, the ALJ's discussion of Dr. Aswad's opinions plainly implies that she would have declined to give the opinions controlling weight had she undertaken the required analysis. Thus, the Court does not rely on this error in granting Plaintiff's motion to remand. *See Mays v. Colvin*, 739 F.3d 569, 575 (10th Cir. 2014) (finding no reversible error where ALJ "implicitly" declined to give controlling weight to treating physician's opinion).

Second, although the ALJ stated that Dr. Aswad's physical examinations did not reveal marked impairments, (AR 1778), she failed to discuss other objective findings that appear to support his opinions regarding Ms. Proano's limited ability to perform non-physical work activities. Most particularly, the ALJ failed to discuss the results of blood tests Dr. Aswad ordered, which, according to his notes, persistently showed iron deficiency anemia and myelodysplasia severe enough to require intravenous iron infusions. (*See, e.g.*, AR 583-97, 1617-18, 1641-65, 1668-70, 1673-81, 1683-1706, 1748, 1750-57, 2244-49, 2256-64.) When viewed in combination with his other objective findings, Dr. Aswad's physical examination findings of pallor, dyspnea, decreased breathing sounds, low back tenderness, and memory loss appear to be consistent with his opinions regarding Ms. Proano's non-exertional limitations. (*See, e.g.*, AR 581, 584, 587, 590, 593, 596, 1617, 1636, 1639, 1642, 1645, 1648-49, 1651, 1654, 1657, 1661, 1664, 1666-67, 1669, 1671, 1674, 1677, 1680, 1684, 1687, 1690, 1693, 1696, 1699, 1702, 1705, 1750-51, 1753-54, 1756, 2233, 2235-36, 2237, 2240, 2242, 2245, 2248, 2250, 2252, 2257, 2260, 2263, 2265, 2267, 2269.) The ALJ's failure to discuss all of Dr. Aswad's objective findings prevents the Court from determining whether she properly weighed this significantly probative evidence in rejecting his opinions. *Jensen*, 436 F.3d at 1165; *Clifton*, 79 F.3d at 1009–10.

Third, in asserting that Ms. Proano's mental status examinations from 2019 to 2021 were generally normal to justify her rejection of Dr. Aswad's opinions, the ALJ failed to discuss or explain why she discounted evidence that Ms. Proano's providers frequently made abnormal mental status examination findings throughout the relevant period.[120] Not only do several of these

---

[120]*See, e.g.*, AR 352-53 (November 2012, restless motor activity, flat affect, anxious mood, circumstantial thought process, impaired immediate memory and concentration, and limited judgment); AR 375 (December 2012, depressed mood and limited judgment and insight); AR 380 (January 2013, dysphoric mood); AR 382-83 (January 2013, anxious mood, restless body movement, limited judgment and insight, and minimal impulse control); AR 466 (November 2014, anxious mood and psychomotor agitation); AR 844-45 (November 2015, dysthymic, depressed mood and affect,

abnormal findings directly note non-exertional limitations such as impaired memory, concentration, or attention, but also they are more broadly consistent with Ms. Proano's reported symptoms of fatigue, pain, and memory loss arising from the physical conditions Dr. Aswad diagnosed and treated. Yet, the ALJ did not discuss these abnormal findings in rejecting Dr. Aswad's opinions, and characterized findings from 2019 to 2021 as "generally … normal." (AR 1778.) Thus, the Court cannot determine whether the ALJ properly weighed this evidence. *See Bryant v. Comm'r, SSA*, 753 F. App'x 637, 641 (10th Cir. 2018) ("[A]n ALJ is entitled to resolve conflicts in the record" but may not "mischaracterize or downplay evidence to support her findings.").

Fourth, the ALJ plainly erred in describing Dr. Martinez as a "psychiatrist," and her error on this point is significant because she relied on this non-examining *psychologist's* opinions to reject the conclusions of two *medical doctors* regarding Ms. Proano's May 2019 brain MRI results.

_____

fair insight, impulsive judgment, and poor impulse control); AR 729 (December 2015, anxious mood, constricted affect, erratic/inconsistent memory, partial insight, and moderately impaired ability to make reasonable decisions); AR 734-35 (December 2015, depressed, anxious, irritable mood and labile affect); AR 855 (December 2015, depressed mood and fair judgment and insight); AR 739 (January 2016, depressed, anxious, irritable mood and labile affect); AR 746-47 (January 2016, anxious, depressed, irritable mood, constricted, labile affect, auditory hallucinations, mood swings, and obsessional paranoid thought content); AR 752 (March 2016, anxious, depressed, irritable mood and anxious, depressed, constricted affect); AR 759 (April 2016, anxious, elevated, depressed mood, labile affect, and mood swings); AR 771 (July 2016, depressed, anxious, irritable mood); AR 784 (September 2016, depressed, anxious mood and flat affect); AR 787-88 (September 2016, avoidant eye contact, slowed activity, depressed mood, flat affect, incoherent thought process, and mildly impaired ability to make reasonable decisions); AR 25 (November 2017, depressed mood and "[s]afety issues due to trauma"); AR 1440 (January 2018, depressed, anxious mood); AR 1086-87 (February 2018, errors spelling five-letter word forward and backward, errors counting serial threes, psychomotor agitation, visual and auditory hallucinations, suicidal ideation, tense mood, and blunted affect); AR 1445 (February 2018, depressed mood); AR 1453-54 (July 2018, depressed mood, flat affect, slumped posture, and impaired reading and writing); AR 1497 (March 2019, anxious mood and poor insight); AR 1726 (October 2019, depressed mood, auditory hallucinations, and impaired memory, attention, and concentration); AR 2013 (March 2020, depressed mood and flat affect); AR 2197-98 (October 2020, depressed, anxious mood, auditory hallucinations, and impaired attention, concentration, and memory); AR 2216 (October 2020, depressed, anxious mood). Moreover, although psychotherapist Cristina Apodaca, LMHC, did not make mental status examination findings at Ms. Proano's telephonic appointments in 2020 and 2021, as late as March 2021, she noted that Ms. Proano was continuing to experience depression and anxiety, and maintained Ms. Proano's diagnoses of MDD, PTSD, GAD, specific reading disorder, and personal history of abuse in childhood. (AR 2106-07.)

(*Compare* AR 1775 (ALJ's decision referring to "medical expert and psychiatrist, Dr. Martinez") *and* AR 1776 (ALJ's decision stating that "Dr. Martinez is an expert psychiatrist") *with* AR 1707-22 (Dr. Martinez's CV indicating that the highest degree she has obtained is a doctorate of clinical psychology).) Specifically, the ALJ relied on Dr. Martinez's testimony that Ms. Proano's brain MRI results would not have "any impact on IQ over the lifespan" and were "not notable in terms of significant findings of early Alzheimer's or dementia," (AR 1149), despite Dr. Dell's determination that the results were "somewhat notable" considering Ms. Proano's age, (AR 1561), and Dr. Aswad's subsequent prescription of donepezil and memantine for Ms. Proano's "dementia." (*See, e.g.*, AR 1754, 1757, 2241, 2243, 2258, 2261, 2264.) Beyond misstating Dr. Martinez's credentials, the ALJ did not explain why she considered Dr. Martinez qualified to dispute Dr. Aswad's and Dr. Dell's conclusions; and, the Court has found no other indication in the record that Dr. Martinez was qualified by training, education, or experience to interpret brain MRI results in the context of Ms. Proano's documented physical impairments, including iron deficiency anemia, post-prandial hypoglycemia, and chronic intestinal malabsorption. Thus, the ALJ's reliance on Dr. Martinez's opinions to reject Dr. Aswad's opinions regarding Ms. Proano's limited ability to perform non-physical work activities is not supported by substantial evidence. *Pickup*, 606 F. App'x at 433; *Stills*, 476 F. App'x at 161.

Also, in asserting that there is "no objective evidence of dementia or severe cognitive deficits," (AR 1778), the ALJ failed to explain why she discounted objective and significantly probative evidence of dementia and severe cognitive deficits other than Ms. Proano's brain MRI results. This includes:

- Deming Public Schools' assessment of specific learning disabilities with "severe" discrepancies in reading, math, and written expression based on testing in January 1997, (AR 604-07);

- LMSW Slee's assessment of "circumstantial" thought process, impaired memory and concentration, and limited judgment on mental status examination in November 2012, (AR 352-53);

- Dr. Nancy Hofmann's assessment of limited judgment and insight on mental status examination in December 2012, (AR 375);

- LMSW Slee's assessment of limited judgment and insight and minimal impulse control on mental status examination in January 2013, (AR 383);

- Dr. Rattan's psychometric testing indicating a full-scale IQ of 51 in November 2014,[121] (AR 467-68);

- LMSW Sarah Walker's assessment of impulsive judgment and poor impulse control on mental status examination in November 2015, (AR 845);

- LMFT Hill's assessment of "erratic," "inconsistent" memory, partial insight, and moderately impaired ability to make reasonable decisions on mental status examination in December 2015, (AR 729);

- LMSW Blanca Ramos-Gaona's assessment of slowed activity, incoherent thought process, and mildly impaired ability to make reasonable decisions on mental status examination in September 2016, (AR 788);

- CSW Lozano's observation that Ms. Proano "became easily flustered and confused" at an appointment in December 2017, (AR 1437);

- Dr. Baum's:  (1) observation that Ms. Proano misspelled a five-letter word forward and backward, performed serial threes incorrectly, and did not attempt serial sevens, and that her performance on an "object recall with distractor task … implicat[ed] cognitive impairment and subnormal IQ," (2) psychometric testing indicating cognitive impairment and a full-scale IQ of 54, and, (3) assessment of "below normal" insight and judgment and observation of restricted prosody with some evidence of halting, on psychological evaluation in February 2018, (AR 1086-87);

- CSW Lozano's observation that Ms. Proano "appeared forgetful and easily overwhelmed" at an appointment in May 2018, (AR 1449);

- LMSW Melendrez's assessment of impaired reading and writing on mental status examination in July 2018, (AR 1454);

---

[121]In February 2018, Dr. Baum noted that Dr. Rattan's IQ assessment indicated "severe cognitive deficits" and a diagnosis of mental retardation. (AR 1087.)

- LPCC Patricia Erickson's assessment of auditory hallucinations and impaired attention or concentration and memory on mental status examination in October 2019, (AR 1726);

- CSW Lozano's observation that Ms. Proano was "easily overwhelmed and confused" at two appointments in May 2020, (AR 2038, 2040);

- LPCC Erickson's assessment of auditory hallucinations and impaired attention or concentration and memory on mental status examination in October 2020, (AR 2198); and,

- CSW Lozano's observation that Ms. Proano was "easily overwhelmed and confused" at appointments in December 2020 and April 2021.[122] (AR 2070, 2111.)

The ALJ's failure to discuss this significantly probative evidence in rejecting Dr. Aswad's opinions prevents the Court from determining whether she properly considered it. *Jensen*, 436 F.3d at 1165; *Clifton*, 79 F.3d at 1009–10.

And finally, the ALJ did not adequately explain how Dr. Aswad's treatment records are inconsistent with his opinions regarding Ms. Proano's markedly limited ability to perform non-physical work activities. The ALJ stated that Dr. Aswad's records reflect "generally normal physical and neurological examinations with no reference to severe psychiatric or cognitive deficits." (AR 1778-79.) But she did not explain why she discounted Dr. Aswad's abnormal examination findings of pallor, dyspnea, decreased breathing sounds, low back tenderness, and memory loss, and, as noted above, she wholly failed to discuss his notations of persistently abnormal blood test results showing myelodysplasia and iron deficiency anemia severe enough to justify repeated intravenous iron infusions. And, also as noted above, she gave inadequate reasons

---

[122]Also, in stating that Ms. Proano's "regular medical appointments do not show an inability to attend to her own appointments," (AR 1777), the ALJ ignored Ms. Proano's testimony that she sometimes misses medical appointments because she forgets them, (AR 1815), as well as corroborating documentation showing that Ms. Proano has sometimes missed scheduled appointments. (*See, e.g.,* AR 386-88, 787, 1424, 1991-92, 1997-98, 2037, 2053, 2072-73, 2109, 2113, 2126, 2174-75, 2186; *see also* AR 2138 (LMHC Apodaca noted that Ms. Proano was unable to meet with her for a full session because Ms. Proano "forgot she had a doctor's appointment" that day).)

for rejecting his diagnosis of dementia based on Ms. Proano's brain MRI results. Again, all of these objective findings appear to be consistent with Dr. Aswad's opinions regarding Ms. Proano's non-exertional limitations.

More generally, the Court is troubled by the ALJ's complete failure, in rejecting Dr. Aswad's opinions, to discuss his frequent notations of Ms. Proano's reported weakness, headaches, dizziness, fatigue, dyspnea, forgetfulness, palpitations, and easy fatigability, all of which likewise appear consistent with his objective findings, diagnoses, treatment, and opinions. (*See* AR 581, 590, 593, 596, 1617, 1636, 1639, 1642, 1645, 1648, 1651, 1654, 1657, 1661, 1664, 1666, 1669, 1671, 1674, 1677, 1680, 1684, 1687, 1690, 1693, 1696, 1699, 1702, 1705, 1750, 1753, 1756, 2233, 2235, 2237, 2240, 2242, 2245, 2248, 2250, 2252, 2257, 2260, 2263, 2265, 2267, 2269); *see generally* https://www.mayoclinic.org/diseases-conditions/iron-deficiency-anemia/symptoms-causes/syc-20355034 (last accessed Feb. 8, 2023) (symptoms of iron deficiency anemia include extreme fatigue, weakness, palpitations, dyspnea, headache, dizziness, and lightheadedness). In its prior decision, the Court specifically directed the agency to consider Ms. Proano's reported symptoms of pain and fatigue in weighing Dr. Aswad's opinions on remand. (AR 1824-42, 1847-55.) Yet, the ALJ failed to heed this mandate.

Even outside the context of weighing Dr. Aswad's opinions, the ALJ's references to Ms. Proano's reported fatigue and headaches are sparse. There are only two references to fatigue. First, the ALJ acknowledged that Ms. Proano's reported "fatigue … would impact her ability to perform heavier exertional work." (AR 1774.) And second, the ALJ noted Dr. Martinez's opinion that Ms. Proano met some listings criteria due to, among other things, being "easily fatigued." (AR 1775.) Neither of these references suggests that the ALJ rejected Ms. Proano's reports of fatigue or provides any justification for doing so. And certainly, neither reference justifies the ALJ's rejection

of Dr. Aswad's opinions that Ms. Proano's fatigue and other symptoms limit her ability to perform non-physical work activities.

Similarly, there are only three references to "migraines" and one to "headaches" in the ALJ's decision. First, the ALJ listed "migraines" as one of Ms. Proano's severe, medically determinable impairments. (AR 1769.) Second, the ALJ asserted that Ms. Proano's "physical impairment[] of … migraines … do[es] not prevent her from performing light exertion and light work." (AR 1774.) Third, the ALJ acknowledged that Ms. Proano's reported headaches, like her reported fatigue, "would impact her ability to perform heavier exertional work." (AR 1774.) And finally, the ALJ acknowledged that Ms. Proano has "nonexertional limitations due to her … migraines." (AR 1777.) The first and last of these references actually support Dr. Aswad's opinions that Ms. Proano's pain and other symptoms limit her ability to perform non-physical work activities, and the second and third pertain only to Ms. Proano's ability to perform physical work. Thus, none of these references suggest that the ALJ could or did discount Ms. Proano's reports of migraine headaches, and none of them justify rejecting Dr. Aswad's opinions that headache pain and other symptoms substantially limit her ability to perform non-physical work activities.

## IV.   CONCLUSION

At a minimum, an ALJ must provide specific, legitimate reasons for rejecting the opinion of a claimant's treating physician. *Allman*, 813 F.3d at 1332; *Langley*, 373 F.3d at 1119; *Robinson*, 366 F.3d at 1082. Here, in assessing Ms. Proano's RFC, the ALJ did not adequately explain her rejection of Dr. Aswad's opinions regarding how Ms. Proano's fatigue, pain, and memory loss from iron-deficiency anemia, migraines, and dementia limit her ability to perform non-physical work activities. As such, the Court cannot determine whether the ALJ properly evaluated Dr. Aswad's opinions and whether her rejection of these opinions was supported by substantial

evidence.[123] Remand is therefore warranted, *Jensen*, 436 F.3d at 1165, and Ms. Proano's Motion

to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 22) is GRANTED.

IT IS SO ORDERED.

_____

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE

---

[123]Additionally, although the Commissioner has not argued harmless error regarding the ALJ's treatment of Dr. Aswad's opinions, (*see generally* Doc. 25), the Court notes that Dr. Aswad opined to significantly greater limitations than the ALJ's RFC appears to accommodate. For example, Dr. Aswad opined that Ms. Proano is unable to attend and concentrate for two-hour periods, maintain regular attendance, be punctual, sustain an ordinary routine without special supervision, complete a normal workday and workweek, and perform at a consistent pace, usefully, regularly, and on a sustained basis. (AR 1571.) Thus, had the ALJ properly weighed Dr. Aswad's opinions regarding Ms. Proano's impairments, she may have given them greater weight and thereby assigned Ms. Proano a more restrictive RFC. In this regard, the Court notes the VE testimony in the record that the inability to concentrate for two-hour segments, the inability to maintain pace, three to four absences per month, being off-task for more than 10 percent of the workday, or requiring extra reminders after initial training, would eliminate competitive employment. (AR 96-97, 1168-69, 1821-22.) Thus, the ALJ's errors were not harmless. *Cf. Mays v. Colvin*, 739 F.3d 569, 578-79 (10th Cir. 2014) (failure to provide adequate reasons for rejecting a medical source opinion "involves harmless error if there is no inconsistency between the opinion and the ALJ's assessment of [RFC]").